**FILED & ENTERED**

**JUN 18 2014**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** Gonzalez **DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Rumio Sato<br>Junko Sato<br><br>Debtor(s). | CHAPTER 7<br><br>Case No.:  1:11-bk-22220-MT<br><br>Adv No:   1:12-ap-01157-MT |
| Michael Williams<br><br>Plaintiff(s),<br>v.<br><br>Rumio Sato<br><br>Defendant(s). | **MEMORANDUM OF DECISION RE: TRIAL ON SECOND AMENDED COMPLAINT FOR: EXCEPTION TO DISCHARGE OF DEBT PURSUANT TO 11 U.S.C. 523(a)(2), (a)(4), AND (a)(19)**<br><br>Date:         February 10, 2014<br>Time:        9:00 a.m.<br>Courtroom:  302 |

   Plaintiff Michael Williams (the "Plaintiff" or "Williams") has brought a nondischargeability action against Debtor Rumio Sato (the "Defendant" or "Sato"), claiming that Sato committed fraud in soliciting his investment in a real estate development project in 2006. As discussed below, the Court finds that the debt is not dischargeable under 11 U.S.C. §§ 523(a)(2) and 523(a)(19).

   On or about October 18, 2011, Debtors Rumio and Junko Sato filed a voluntary chapter 11 petition (the "Debtors"). Upon Debtors' motion, the case was later converted to chapter 7. On or about May 4, 2012, Williams filed an adversary complaint against Sato to determine the

-1-

dischargeability of Plaintiff's debt under §§ 523(a)(2), (a)(4), and (a)(19). The debt arose from Plaintiff's investment of $150,000 in Defendant's real estate development project located at 2470 Lynnfield Circle, El Sereno, California (the "Lynnfield Property" or "Lynnfield Project"). The trial was held on February 10, 2014.

**Findings of Fact and Conclusions of Law[1]**

Sometime in 2006, Williams was introduced to Sato through Sato's assistant, with whom Williams became acquainted with at a car wash he frequented. Williams and Sato had no business or personal relationship prior to the Lynnfield Project at issue. At that time, Williams was considering entering into some short-term investments.

Sato held numerous meetings with Williams at Sato's house, where Sato introduced his prosperous real estate business. Sato explained that he had a history of purchasing properties at low cost and then developing and selling them for a lucrative return. Sato indicated he was able to do so because of his access to inside information. Sato showed Williams his own house as one of his remodeling projects. Sato had his real estate broker and contractor licenses hanging on the walls in his house, together with pictures of his real estate developments. Sato also had notebooks describing the portfolio of his different real estate projects. See Plaintiff's Trial Exhibit 24. During the initial meetings, Sato drove Williams to see large parcels of undeveloped land which he stated he owned and was going to develop.

After learning that Williams was looking for a quick turnaround, Sato recommended the Lynnfield Property as a "ready-to-go" project. Sato told Williams that he could get the Lynnfield Project running once he had an investment of $150,000. Sato explained he would then obtain a construction loan on the property. Sato showed Williams the blueprints of a single family residence that he was going build on the property. The construction was estimated to take only 9-10 months. See Plaintiff's Trial Exhibit 17; Defendant's Trial Exhibit J. Sato provided Williams with a Construction Timeline and Events detailing the different stages of construction. See Plaintiff's Trial Exhibit 18; Defendant's Trial Exhibit K. Sato also took Williams to meet with the professionals who would undertake the Lynnfield project and they discussed the timeline and other construction matters in Williams' presence.

Sato eventually proposed an investment opportunity to Williams. In exchange for the investment of $150,000, Williams would receive: (1) 50% ownership in the Lynnfield Property through a Quitclaim Deed (the "Quitclaim Deed"), (2) 20% interest on the investment due June 30, 2007, and (3) repayment of the investment upon sale or refinancing of the completed Lynnfield Property. Sato executed the Quitclaim Deed in favor of Williams, see Defendant's Trial Exhibit L, but he convinced Williams not to record it so that Sato could more easily obtain a construction loan. In addition, Sato later wrote a check for $30,000 payable to Williams as an interest payment dated June 30, 2007. See Defendant's Trial Exhibit R.

The terms of the deal are evidenced in two documents. Sato first executed a "Note Secured by Deed of Trust" dated December 22, 2006 (the "Note"). See Plaintiff's Trial Exhibit 22; Defendant's Trial Exhibit H. The Note was roughly drafted with handwritten remarks. The Note only contained the terms of the interest payment and repayment of the investment upon sale

---

[1] The findings of fact and legal conclusions constitute the court's findings under Federal Rule of Civil Procedure 52(a), applicable in this bankruptcy proceeding under Federal Rule of Bankruptcy Procedure 9014. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

-2-

of the Lynnfield Property. Id. It was never recorded. On January 1, 2007, the parties then drafted and executed a Real Estate Partnership Agreement (the "Agreement"). See Plaintiff's Trial Exhibit 17; Defendant's Trial Exhibit J. The Agreement laid out the major terms of the deal.

The construction took four years and was finally completed in March 2011. The real estate market changed dramatically from 2007 to 2011. During this period, Williams frequently emailed Sato, asking for progress reports and repayment of his investment. See Defendant's Trial Exhibits V to JJ. When the Lynnfield Property was in a marketable condition, Williams urged Sato to sell it. See Defendant's Trial Exhibit O p. 3-4. The sale turned out to be futile and the property was worth much less than the secured debt on the property. Furthermore, Sato could not afford the mortgage payments. Sato requested Williams to pay the mortgage with him, or warned that the property could be foreclosed. Williams declined to pay the mortgage. In December 2011, the secured lender foreclosed on the Lynnfield Property.

At trial, the key facts in dispute were: 1) what did Sato represent to Williams; 2) what was the actual transaction between them; and 3) whether Williams reasonably and justifiably relied on Sato's representations. The specific disputed facts are discussed in the context of each element of the § 523 counts. During the trial, there was substantial direct and cross examination of both parties. Williams' testimony was detailed, consistent, and credible. Sato, on the other hand, appeared to be evasive and cautious. [2]

In an action to determine the dischargeability of a debt, Plaintiff has the burden of proof to establish the elements of discharge exceptions by a preponderance of evidence. See Grogan v. Garner, 498 U.S. 279, 291 (1991). The provisions of the § 523(a) exceptions to discharge should be construed narrowly. See, e.g., Cal. Franchise Tax Bd. v. Jackson (In re Jackson), 184 F.3d 1046, 1051 (9th Cir.1999); Bowen v. Francks (In re Bowen), 102 B.R. 752, 756 (B.A.P. 9th Cir. 2001).

### I. Fraud under § 523(a)(2)

Section 523(a)(2) excepts from discharge any debt to the extent obtained by

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
(B) use of a statement in writing
 (i) that is materially false;
 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for such money … reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive

Section 523(a)(2)(A) and (B) are mutually exclusive, although they have substantially similar elements. See In re Kirsh, 973 F.2d 1454, 1457 (9th Cir. 1992). Section 523(a)(2)(A)

---

[2] For instance, he first claimed that the notebooks of his real estate portfolio did not exist until 2010 or 2011. He later conceded that they could have existed in 2006 as Williams had stated, after he was pointed to the copyright notation of 2006 on the notebook. See Plaintiff's Trial Exhibit 24.

applies to misrepresentations other than those respecting the debtor's financial condition; while § 523(a)(2)(B) refers specifically to *written* statements of financial condition. Therefore, oral misrepresentations regarding the debtor's financial condition are not under the purview of § 523(a)(2). See In re Joelson, 307 B.R. 689, 692-93 (10th Cir. B.A.P. 2004), *aff'd* 407 F.3d 700 (10th Cir. 2006), *cert denied* 126 S.Ct. 2321 (2006). Such oral misrepresentations are not at issue here.

There is another key difference between the two subsections on the reliance element. Section 523(a)(2)(A) employs a subjective standard that "justification is a matter of the qualities of the particular plaintiff." Field v. Mans 516 U.S. 59, 70, 71 (1995). Section 523(a)(2)(B), on the other hand, has an objective standard for reliance in examining the facts and circumstances surrounding the misuse of the statement in writing regarding the debtor's financial condition. In re Trejo, 2011 WL 5557423, at *5 (Bankr. N.D. Cal. Nov. 3, 2011).

As discussed below, the Court finds that Defendant engaged in fraud in luring Plaintiff to invest in his Lynnfield Project under § 523(a)(2)(A). There is no need to analyze § 523(a)(2)(B) because written statements of Sato's financial condition were not actually an issue or pursued at trial.

The Ninth Circuit has held that a claim for fraud under § 523(a)(2)(A) includes five elements: (1) the debtor made a false statement or engaged in deceptive conduct; (2) the debtor knew the representation to be false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained damage from its reliance. In re Slyman, 234 F.3d 1081, 1085 (9th Cir. 2000).

*(i)    Misrepresentations of Fact by Debtor*

Plaintiff alleges that Defendant misrepresented to him, orally and in writing that: (1) Sato was an experienced real estate developer, with a history of successful real estate deals; (2) Sato made an informed estimate that the construction on the Lynnfield Property would be completed within a year, based on his experience as well as information from the professionals he took Williams to meet; and (3) the investment proceeds would be spent on the Lynnfield Property as implied by the language of the Note and the Agreement.

These representations are solely regarding Sato's real estate developer experience and expertise as well as the details of the investment in the Lynnfield Property. They are not about Sato's net worth or income, although his financial condition was part of the image he crafted for Williams.

The purpose of the misrepresentations was to create the impression that Sato was an experienced, successful, and knowledgeable real estate developer. Sato held the meetings with Williams in his house, where he showed his work product and his financial capability. He drove Williams to see the real estate empire he was developing, simply to strengthen Williams' confidence in his business. Sato testified that he did not intend to solicit Williams' investment in the other projects, because they were in a very preliminary stage and they required large investments that Williams probably could not afford. He prepared notebooks of his real estate portfolio with pictures of land he owned and the flowery descriptions of the proposed buildings. Accordingly, Sato appeared to be a successful business developer.

Sato held himself out as having professional and insider knowledge to ensure the success of his business. Sato showed glimpses of the arrogance behind his sales pitch in his testimony during trial. Sato claimed to have the ability to procure inside information of discounted land. Sato had professional credentials as a broker and a contractor. Sato appeared to be on top of the

technicalities of the construction plan in his presentation of blueprints and the construction timeline. Sato took Williams to meet with construction professionals and he led the discussion about the construction on the Lynnfield Property.

*(ii)    That Debtor knew to be false*

The evidence also shows that Sato knew these statements to be false when he made them, or alternatively, he made them with reckless disregard for the truth of the statements. See In re Gertsch, 237 B.R. 160, 167 (9th Cir. B.A.P. 1999), citing In re Houtman, 568 F.2d 651, 656 (9th Cir. 1978).

Sato knew the impression he conveyed to Williams of his real estate experience and expertise was fabricated. Sato knew he was far from being an experienced real estate developer. He had little, if any, experience as a real estate developer when he met Williams. He had just obtained his contractor license in 2005, only one year prior to meeting Williams. The pretty pictures and flowery language in his real estate portfolio notebooks that he presented to Williams were his dreams and ambitions, not what had actually been done.

Furthermore, Sato recklessly estimated the construction time on the Lynnfield Property. He knew it was simply a general estimate with little, if any, investigation into the particular landscape of the Lynnfield Property or the relevant administrative approval process. He made little effort to provide Williams with a good faith estimate of the construction time. Nonetheless, he told Williams that it would be a quick turnaround and put in the Agreement that the project was to take approximately 9 to 10 months, absent unforeseen events.

Even if Sato had believed the estimate to be true, he knowingly or recklessly made false statements regarding the reliability of the estimate. Although he insisted in putting in the language about delay caused by unforeseen events in the Agreement, he had no experience or basis to predict what types of events could be foreseen at that time as he had never even built a single family residence.

Sato also knew that he would not deposit Williams' investment in a separate account dedicated to the Lynnfield Property. At the time, Sato knew he would use the money for whatever he needed. Although Williams made the investment specifically for the Lynnfield Property, Sato deposited Williams' investment funds in his personal account. The Note and the Agreement both identified the deal as development on the Lynnfield Property. According to his testimony, however, Sato withdrew substantial amounts of cash from his personal account shortly after depositing Williams' investment funds and then purchased several properties for his own real estate portfolio. Sato never provided Williams with an accounting of his investment funds. The only accounting Sato provided Williams was for "out-of-pocket" expenses and not for Williams' investment funds. See Plaintiff's Trial Exhibit 20. At trial, Sato denied he had used the money elsewhere but claimed he could have used it however he wanted.

*(iii)    Made with the intent to deceive Plaintiff*

Sato made the representations, discussed in section (i) above, with the intent to deceive Williams. Sato's career goal was to use the funds from others for his budding real estate business, even if he had to shade the truth to reach it. Sato's statements and conduct were designed to impress Williams to get him to invest in the Lynnfield Project. Scienter is also demonstrated by Sato's argument during trial that there were no strings attached to Williams' money and he could do whatever he wanted with it, although Williams was made to believe differently. Sato's attitude throughout the trial revealed his state of mind from the start.

Sato argued that had he intended to deceive Williams he would not have executed the Quitclaim Deed or made the $30,000 interest payment. The argument however, is not convincing. The Quitclaim Deed was used to induce Williams to continue with the investment. While Sato executed the Quitclaim Deed transferring 50% interest in the Lynnfield Property to Williams, he persuaded Williams not to record the Quitclaim Deed. Therefore, the Quitclaim Deed had very limited legal effect. Sato then had to make the $30,000 interest payment so that Williams would not sue him earlier. Sato's actions were just lulling activities that kept the deal going.

Sato's beliefs that things would all work out and that he would be able to perform under the Agreement are irrelevant as to his scienter at the time he made the misrepresentations. He knowingly made false statements in order to obtain Williams' investment. Sato's belief that he and Williams would both make money from the booming real estate market, is consistent with his intent to deceive Williams, as he believed, in the end, he could probably get away with any consequences of his fraudulent representations.

*(iv)    Plaintiff justifiably relied on the misrepresentations*

In terms of justifiable reliance under §523(a)(2)(A), we inhabit the particular mindset and circumstances of the plaintiff in question to determine whether or not a plaintiff is willfully blind to the potential for fraud presented to them. In re Trejo, 2011 WL 5557423, at *4 (Bankr. N.D. Cal. Nov. 3, 2011). A person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth. In re Kirsh, 973 F.2d at 1459.

In this case, Williams justifiably relied on Sato's representations. With only a technology background, Williams had limited knowledge or experience with real estate development. Williams' only real estate experience was the purchase of his residential property. Williams met Sato several times before finally deciding to invest in the Lynnfield Property. Sato used each occasion to present himself as an experienced real estate developer who knew what he was doing. Sato took Williams on trips to other real estate projects. Williams only knew what Sato, a successful and experienced real estate developer, had told him. Williams relied on Sato's choice of the Lynnfield Property to be the one to invest in. He relied on Sato's promise that the construction would be completed within a year and he would get his investment back in full together with interest and profits. Without the misrepresentations about Sato's experience, the estimate of a 10-month turnaround, and the promise to use the investment on the Lynnfield Property, Williams would not have invested in the Lynnfield Project.

During the trial, Sato argued that Williams should have discovered that he was not an experienced real estate developer and Williams should not have blindly trusted Sato. As the contractor license shown in Sato's house displayed an issuing date in 2005, Williams should have realized that Sato only had at most one-year of contractor experience. Sato contends that Williams could have and should have contacted other professionals before he made a decision on the investment and before deciding not to record the Quitclaim Deed. Sato also testified that when he took Williams to meetings with construction professionals they talked about the fact that the Construction Timeline and Events were just a general estimate and a soil sample of the Lynnfield Property had not yet been taken.

With the benefit of the hindsight, it is true that Williams should have sensed the red flags and should have consulted with some professionals. This is not the legal standard, however. The test is whether a person with Williams' experience and mindset is justified in trusting Sato. The fraud statutes also protect the gullible and the unsophisticated.

The meeting with other construction professionals might have given Williams an inclination that the anticipated construction time might be off but not by four years. In addition, there was insufficient information at that point to warn Williams from relying on Sato's misrepresentations. With the buildup of trust and the complicated technicalities of real estate construction, Williams was justified in deferring to Sato's experience and judgment.

*(v)    Plaintiff sustained damages as a result of the misrepresentations*

Williams' loss of $150,000 was actually and proximately caused by Sato's misrepresentations. Williams lost his investment when the Lynnfield Property was foreclosed on by the secured lender. But for Sato's misrepresentations, Williams would not have invested in the Lynnfield Property and subsequently lost his investment.

Sato argued that the misrepresentations were not the proximate cause of the loss. Prior to the foreclosure, Sato told Williams that he could no longer make the loan payments and, if Williams did not repay the loan, the secured lender could foreclose on the property. He argued that Williams' refusal to repay the loan was the proximate cause of his loss.

Williams' only obligation under the Agreement, however, was to invest $150,000 in the Lynnfield Property. Sato took out the construction loan under his own name. Williams never assumed the duty to repay the loan. The foreclosure was therefore caused by Sato's default. Williams had no obligation to put in more money when Sato initially asked him. It is also speculative to know whether paying the loan would have saved Williams' investment.

Sato also argued that he and Williams formed a partnership, so Williams should take the losses along with the profits. Williams and Sato both testified that the Agreement was drafted with input from both parties, but Sato was the one calling it a "partnership" agreement.

The Court determined that the relationship between the parties was not a partnership, notwithstanding the title of the Agreement. Williams did not intend to form a partnership with Sato. Williams expected to recover the investment in full upon completion. There were no formalities for a partnership. Sato testified that he did not have bank accounts for the partnership. Sato never filed a partnership tax return or felt he should do so.

Sato argued that Williams had control over the project because Williams frequently emailed him for progress reports, and it was Williams' decision to sell the Lynnfield Property. Sato, in fact, obtained written consent from Williams before he listed the property for sale.

Williams did not have the control he would have had, had they formed a partnership. The progress reports Sato gave to Williams upon Williams' request were consistent with updating an investor on the progress of an investment project. Williams did not choose subcontractors, materials, or even the listing price. He did not get bank account statements or sign on the construction loan. Instead, Williams listened to Sato and acceded to Sato's decisions during each step of the project.

Therefore, the Court finds that Sato committed fraud when he engaged Williams in the real estate development on the Lynnfield Property. Williams' claim is nondischargeable under § 523(a)(2)(A).

## II. Fraud in Connection with Securities Transactions under § 523(a)(19)

Williams also alleges a cause of action under § 523(a)(19). That section provides that any debt is not discharged if it -

(A) is for –
- (i) the violation of any of the federal securities laws …, any of the state securities law, or any regulations or order issued under such federal or state securities laws, *or*
- (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; **and**

(B) results, before, or, or after the date on which the petition was filed, from –
- (i) any judgment, order, consent order, or decree entered in any federal or state judicial or administrative proceeding;
- (ii) any settlement agreement entered into by the debtor; or
- (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

11 U.S.C. § 523(a)(19) (emphasis added).

The two subparts of § 523(a)(19) are conjunctive requirements. Plaintiff must establish both parts by a preponderance of evidence.

### *§ 523(a)(19)(B)*

A threshold question is whether § 523(a)(19)(B) requires that Plaintiff's claim be first memorialized in an order or settlement outside of this Court. There is a split in authority on this question. The narrower view holds that § 523(a)(19)(B) requires the debt to be first memorialized in a settlement or order by a nonbankruptcy forum. See In re Collier, 497 B.R. 877, 903 (Bankr. E.D. Ark. 2013); In re Bundy, 468 B.R. 916, 922 (Bankr. E.D. Wash. 2012); In re Pujdak, 462 B.R. 560, 574 (Bankr. D.S.C. 2011); In re Jafari, 401 B.R. 494, 497 (Bankr. D. Colo. 2009); In re Zimmerman, 341 B.R. 77, 80 (Bankr. N.D. Ga. 2006).

The more expanded view holds that the bankruptcy court can determine the liability, damages, and dischargeability of the debt for securities violations and securities fraud and issue its own judgment to satisfy § 523(a)(19)(B). See In re Hill, 495, B.R. 646, 661 (Bankr. D.N.J. 2013); In re Jensen-Ames, 2011 WL 1238929, *8 (Bankr. W.D. Wash. March 30, 2011) (unpublished); In re Jansma, 2010 WL 282511, *5 (Bankr. N.D. Ill. Jan 21, 2010); In re Chan, 355 B.R. 494, 505 (Bankr. E.D. Penn. 2006).

This Court concludes that the language of the provision, as well as the legislative history and policy considerations, warrants the more expanded view. The more expanded approach to § 523(a)(19)(B) is closer in line with the broad language of the Code, the effort to make it even broader by the BAPCPA amendment and the need to litigate all exceptions to discharge in one proceeding. To require a piecemeal adjudication of a § 523(a)(19) issue elsewhere would not make sense where a § 523(a)(2) exception is already being litigated.

### § 523(a)(19)(A)

Section 523(a)(19)(A) includes both securities violations under § 523(a)(19)(A)(i) and common law fraud in securities transactions under § 523(a)(19)(A)(ii). In re Civiello, 348 B.R. at 464. As the Court has already decided that Defendant committed actual fraud in the transaction under § 523(a)(2), thus, the sole remaining issue is whether the transaction is a security.

Cal. Corp. Code § 25019 defines a security and includes an expansive list of transactions and instruments deemed to be securities. Under California law, a transaction is an investment contract if it meets either the "risk capital" test under Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 815 (1961), or the federal test under SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946) ("Howey"). Reiswig v. Dep't of Corp., 144 Cal.App.4th 327, 334 (Cal. Ct. App. 2006). Under the federal Howey test, a security is a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. 328 U.S. at 298-99. There are three elements: (1) an investment of money, (2) in a common enterprise, and (3) with an expectation of profits produced by the efforts of others. SEC v. Rubera, 350 F.3d 1084, 1090 (9th Cir. 2003).

In Howey, the defendant offered investors a contract to purchase a small portion of an orange grove together with a 10-year service contract under which the defendant agreed to maintain and harvest the orange grove plot for the investor. See 328 U.S. at 295-96. The investors were individuals who lacked the knowledge or resources for orange cultivation and harvesting. Id. The Supreme Court ruled that the transaction was a security. 328 U.S. at 298-99. The defendant was offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise. Id. at 299. The investors had no desire to occupy the land or to develop it themselves; they were attracted solely by the prospects of a return on their investment. Id. at 300.

The Lynnfield property transaction is similar to that in Howey, although on a much smaller scale and duration. Sato, as the owner of the property, offered Williams the opportunity to contribute money toward building a single-family residence on the property to sell in the future. Williams invested money in the project with an expectation of profits produced by Sato's efforts in managing the construction and the sale of the property. Williams had no experience in this area or desire to actively participate in the construction or sale of the property. The success of the project was completely under Sato's control.

Sato alleges that because Williams was the only investor in the transaction, it cannot constitute a security. The number of investors is a factor to be considered; but it is not conclusive. As stated in People v. Park, when considering the meaning of an investment contract, courts have consistently emphasized whether or not the investor has substantial power to affect the success of the enterprise. 87 Cal.App.3d 550, 563 (Cal. Ct. App. 1978). In Park, the defendant solicited only two investors in his condominium construction project and the court found it to be an investment contract. 87 Cal.App.3d at 563.

An investment of money requires the investor be subject to financial loss. Rubera, 350 F.3d at 1090. Here. Sato does not allege the transaction was not an investment of money, but he contends that the investment was adequately secured by the Note and thus, a loan. The evidence shows, however, that Sato himself referred to the transaction as an "investment" and not a loan in his email to Plaintiff. See Defendant's Trial Exhibit AA. Form should be disregarded for substance and emphasis should be placed on the economic reality. Howey, 328 U.S. at 298. Thus, the Court finds the transaction was not a loan.

Sato argues that there was no common enterprise because Williams' funds should be counted solely towards the Note. In addition, Sato claims he transferred 50% interest in the property with the Quitclaim Deed. The value of the Note and the granting of the Deed are irrelevant because Williams was instructed not to record them and they were not recorded. Also, Williams was not really protected by the deed because the investment structure required him not to record it.

Williams had a reasonable expectation of profits. Sato agreed in his testimony that Williams bargained for the Agreement because he wanted to take advantage of the profit from the Lynnfield Project. Williams and Sato discussed a 50/50 distribution of the profit from the proposed sale of the completed project.

The Ninth Circuit has rejected a strict interpretation in favor of a more flexible focus on whether the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts that affect the failure or success of the enterprise. Rubera, 350 F.3d at 1091.

Sato argues that Williams actively participated in the project and had an interest in the property; therefore, Williams was not expecting profit solely from Sato's efforts. The evidence shows, on the contrary, that Williams had no meaningful power over the project. Besides his initial capital contribution, Williams' alleged participation had little effect on the success of the project. Williams' emails merely requested progress reports. Williams' 50% interest in the Lynnfield Property had limited effect, as Sato told him not to record the Deed or he could not get a construction loan. Williams did push Sato to sell the property after three years but he had no control up to then, and the sale price and listing process were all under Sato's control. Sato could have refused to list the property for sale at that time under the terms of the Agreement. Williams could have done little with the unrecorded Deed. Even if Williams were to have recorded the Deed at some point, it did not give him meaningful power in the project, as it would come after the lien of the construction loan.

As discussed, Sato's argument that they formed a partnership to share profits and loss is rejected. Even if their relationship was a partnership, the interest in the partnership would be a security under Consolidated Management Group, LLC v. Dep't of Corp. See 162 Cal. App. 4th 598, 610 (Cal. Ct. App. 2008). A limited partner's membership in a typical limited liability partnership is a security, as the profits came substantially from efforts of the general partner. Id.

The factors to determine when the a general partnership or joint venture can be designated as a security include: (1) the agreement leaves so little power in the hands of the partner or venturer that the arrangement in fact mimics a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.". Id. at 611.

The distribution of power under the Agreement accorded Sato with full control of the "partnership" as (1) he was the owner of the property; (2) he was the general contractor of the construction; (3) he was the broker in selling the property; and (4) Williams had no power, expertise, or desire, to engage in the construction and sale of the property. If it was a partnership, Williams would be a typical "passive" partner or venturer whose sole responsibility is to make capital investment in exchange for a return of the fixed interest plus property value

appreciation.

In conclusion, the transaction between the parties constitutes an investment contract under the federal test. Therefore, it is a security as defined under Cal. Corp. Code § 25019. With this Court's finding of fraud in connection with this transaction in Plaintiff's § 523(a)(2) claim, Defendant also committed fraud in connection with the sale of a security.

**Conclusion**

Plaintiff has met his burden of proving by a preponderance of evidence that Defendant engaged in fraud in soliciting an investment from Plaintiff in the Lynnfield Project. The transaction involved a sale or an offer of a security. Therefore, Plaintiff's claim is not dischargeable under both §§ 523(a)(2) and (a)(19).

**Claim Amount**

Regarding the amount of claim, Plaintiff seeks damages of $150,000 plus interest at the federal interest rate from January 1, 2010. Defendant has objected, contending that $30,000 was paid and received by Plaintiff in 2007 and there was no basis for a provision of interest. It is unclear why Plaintiff accumulated interest from January 2010. Plaintiff also needs to explain why the $30,000 payment is not counted towards the damages.

A hearing will be held as to the damages amount on July 31, 2014, at 11:00 a.m. Plaintiff is ordered to file an explanation of how damages should be calculated by July 3, 2014. Defendant may respond by July 15, 2014. An order and judgment will be entered following that hearing.

###

Date: June 18, 2014

Maureen A. Tighe
United States Bankruptcy Judge